APPEAL,CLOSED,CONSOL,TYPE–C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:18–cv–02841–RMC</u>

AMERICAN HOSPITAL ASSOCIATION et al v. AZAR
Assigned to: Judge Rosemary M. Collyer
Cause: 28:1331 Fed. Question: Review Agency Decision

Date Filed: 12/04/2018
Date Terminated: 10/23/2019
Jury Demand: None
Nature of Suit: 151 Contract: Recovery
Medicare
Jurisdiction: U.S. Government Defendant

**<u>Plaintiff</u>**

**AMERICAN HOSPITAL ASSOCIATION**

represented by **Catherine Emily Stetson**
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637–5491
Fax: (202) 637–5910
Email: <u>cate.stetson@hoganlovells.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Margaret Cook**
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637–6684
Fax: (202) 637–5910
Email: <u>susan.cook@hoganlovells.com</u>
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**ASSOCIATION OF AMERICAN MEDICAL COLLEGES**

represented by **Catherine Emily Stetson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Margaret Cook**
(See above for address)

**<u>Plaintiff</u>**

**MERCY HEALTH MUSKEGON**

represented by **Catherine Emily Stetson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Margaret Cook**
(See above for address)

**Plaintiff**

**CLALLAM COUNTY PUBLIC HOSPITAL NO. 2**
*agent of*
OLYMPIC MEDICAL CENTER

represented by **Catherine Emily Stetson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Margaret Cook**
(See above for address)

**Plaintiff**

**YORK HOSPITAL**

represented by **Catherine Emily Stetson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Margaret Cook**
(See above for address)

**Plaintiff**

**UNIVERSITY OF KANSAS HOSPITAL AUTHORITY**
*in CA 19–132*

represented by **Joel L. McElvain**
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006
(202) 626–2929
Fax: (202) 626–3737
Email: jmcelvain@kslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006
(202) 626–5540
Fax: (202) 626–3737
Email: mpolston@kslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COLUMBUS REGIONAL HEALTHCARE SYSTEM**
*in CA 19–132*

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COPLEY MEMORIAL HOSPITAL, INC.**
*in CA 19−132*
*doing business as*
RUSH COPLEY MEDICAL CENTER

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EAST BATON ROUGE MEDICAL CENTER, LLC**
*in CA 19−132*
*doing business as*
OCHNER MEDICAL CENTER −
BATON ROUGE

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FAYETTE COMMUNITY HOSPITAL, INC.**
*in CA 19−132*
*doing business as*
PIEDMONT FAYETTE HOSPITAL, INC.

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FLORIDA HEALTH SCIENCES CENTER INC.**
*in CA 19−132*
*doing business as*
TAMPA GENERAL HOSPITAL

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MONTEFIORE HEALTH SYSTEM, INC.**
*in CA 19−132*

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*

*doing business as*
MONTEFIORE MEDICAL CENTER
*doing business as*
ST. LUKE'S CORNWALL HOSPITAL
*doing business as*
WHITE PLAINS HOSPITAL

*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MONTEFIORE HEALTH SYSTEM,
INC.**
*in CA 19−132*

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MONTEFIORE HEALTH SYSTEM,
INC.**
*in CA 19−132*

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NORTHWEST MEDICAL CENTER**
*in CA 19−132*

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**OCHSNER CLINIC FOUNDATION**
*in CA 19−132*

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **OSF HEALTHCARE SYSTEM** | represented by | **Joel L. McElvain** |
| *in CA 19−132* | | (See above for address) |
| *doing business as* | | *LEAD ATTORNEY* |
| OSF HEART OF MARY MEDICAL | | *ATTORNEY TO BE NOTICED* |
| CENTER | | |
| *doing business as* | | **Mark D. Polston** |
| OSF SACRED HEART MEDICAL | | (See above for address) |
| CENTER | | *LEAD ATTORNEY* |
| *doing business as* | | *ATTORNEY TO BE NOTICED* |
| OTTAWA REGIONAL HOSPITAL & | | |
| HEALTHCARE CENTER | | |
| *doing business as* | | |
| OSF SAINT ELIZABETH MEDICAL | | |
| CENTER | | |
| *doing business as* | | |
| SAINT ANTHONY MEDICAL CENTER | | |
| *doing business as* | | |
| SAINT ANTHONY'S HEALTH CENTER | | |
| *doing business as* | | |
| ST. JOSEPH MEDICAL CENTER | | |

**Plaintiff**

| | | |
|---|---|---|
| **PIEDMONT ATHENS REGIONAL** | represented by | **Joel L. McElvain** |
| **MEDICAL CENTER, INC.** | | (See above for address) |
| *in CA 19−132* | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | **Mark D. Polston** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **PIEDMONT HOSPITAL, INC.** | represented by | **Joel L. McElvain** |
| *in CA 19−132* | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | **Mark D. Polston** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **PIEDMONT MOUNTAINSIDE** | represented by | **Joel L. McElvain** |
| **HOSPITAL, INC.** | | (See above for address) |
| *in CA 19−132* | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PIEDMONT NEWNAN HOSPITAL,**   represented by   **Joel L. McElvain**
**INC.**                                            (See above for address)
*in CA 19−132*                                      *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RUSH OAK PARK HOSPITAL, INC.**   represented by   **Joel L. McElvain**
*in 19−132*                                         (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RUSH UNIVERSITY MEDICAL**   represented by   **Joel L. McElvain**
**CENTER**                                     (See above for address)
*in CA 19−132*                                 *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SARASOTA MEMORIAL HOSPITAL**   represented by   **Joel L. McElvain**
*in CA 19−132*                                     (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHARLOTTE–MECKLENBURG HOSPITAL AUTHORITY**
*in CA 19–132*
*doing business as*
ATRIUM HEALTH ANSON
*doing business as*
ATRIUM HEALTH CLEVELAND
*doing business as*
ATRIUM HEALTH KINGS MOUNTAIN
*doing business as*
ATRIUM HEALTH LINCOLN
*doing business as*
ATRIUM HEALTH PINEVILLE
*doing business as*
ATRIUM HEALTH UNION
*doing business as*
ATRIUM HEALTH UNIVERSITY CITY
*doing business as*
CAROLINA HEALTHCARE SYSTEM STANLY
*doing business as*
CAROLINA HEALTHCARE SYSTEM NORTHEAST
*doing business as*
CAROLINAS MEDICAL CENTER

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA**
*in CA 19–132*
*doing business as*
UNIVERSITY OF VIRGINIA MEDICAL CENTER

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**VANDERBILT UNIVERSITY MEDICAL CENTER**
*in CA 19–132*

represented by **Joel L. McElvain**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SCOTLAND HEALTH CARE SYSTEM**

represented by **Joel L. McElvain**
(See above for address)

*in CA 19−132*
*doing business as*
SCOTLAND REGIONAL

**LEAD ATTORNEY**
*ATTORNEY TO BE NOTICED*

**Mark D. Polston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ALEX M. AZAR, II**
*in his official capacity as SECRETARY OF*
*HEALTH AND HUMAN SERVICES*

represented by **Bradley P. Humphreys**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 305−0878
Fax: (202) 639−6066
Email: bradley.humphreys@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Michael Sandberg**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Room 11004
Washington, DC 20005
(202) 514−5838
Fax: (202) 616−8202
Email: justin.sandberg@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICA'S ESSENTIAL**
**HOSPITALS**

represented by **Barbara D. A. Eyman**
EYMAN ASSOCIATES, PC
1120 G Street NW
Suite 770
Washington, DC 20005
(202) 567−6203
Email: beyman@eymanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/04/2018 | 1 | | COMPLAINT against ALEX M. AZAR, II ( Filing fee $ 400 receipt number 0090−5822140) filed by Clallam County Public Hospital No. 2 d/b/a Olympic Medical Center, AMERICAN HOSPITAL ASSOCIATION, MERCY |

| | | |
|---|---|---|
| | | HEALTH MUSKEGON, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, YORK HOSPITAL. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Liu, # 3 Summons Azar, # 4 Summons Whitaker)(Stetson, Catherine) (Entered: 12/04/2018) |
| 12/04/2018 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN HOSPITAL ASSOCIATION (Stetson, Catherine) (Entered: 12/04/2018) |
| 12/04/2018 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ASSOCIATION OF AMERICAN MEDICAL COLLEGES (Stetson, Catherine) (Entered: 12/04/2018) |
| 12/04/2018 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by Clallam County Public Hospital No. 2 d/b/a Olympic Medical Center (Stetson, Catherine) (Entered: 12/04/2018) |
| 12/04/2018 | 5 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by YORK HOSPITAL (Stetson, Catherine) (Entered: 12/04/2018) |
| 12/04/2018 | 6 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by MERCY HEALTH MUSKEGON (Stetson, Catherine) (Entered: 12/04/2018) |
| 12/04/2018 | 7 | NOTICE of Appearance by Susan Margaret Cook on behalf of All Plaintiffs (Cook, Susan) (Entered: 12/04/2018) |
| 12/06/2018 | | Case Assigned to Judge Rosemary M. Collyer. (zrdj) (Entered: 12/06/2018) |
| 12/06/2018 | 8 | SUMMONS (3) Issued Electronically as to ALEX M. AZAR, II, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zrdj) (Entered: 12/06/2018) |
| 12/07/2018 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 12/6/2018. Answer due for ALL FEDERAL DEFENDANTS by 2/4/2019. (Stetson, Catherine) (Entered: 12/07/2018) |
| 12/20/2018 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ALEX M. AZAR, II served on 12/13/2018. (Cook, Susan); Modified text on 12/26/2018 (zth). (Entered: 12/20/2018) |
| 12/20/2018 | 11 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 12/12/2018. (Cook, Susan) (Entered: 12/20/2018) |
| 01/25/2019 | 12 | MOTION to Stay in Light of Lapse of Appropriations by ALEX M. AZAR, II (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 01/25/2019) |
| 01/28/2019 | | MINUTE ORDER denying 12 Motion to Stay and granting extension of time to answer or otherwise respond. Defendants shall answer or otherwise respond to the Complaint no later than 2/25/2019. Signed by Judge Rosemary M. Collyer on 1/28/2019. (DAS) (Entered: 01/28/2019) |
| 01/28/2019 | | |

| | | |
|---|---|---|
| | | Set/Reset Deadlines/Hearings: Answer or other response to Complaint due by 2/25/2019. (zcdw) (Entered: 01/30/2019) |
| 01/29/2019 | 13 | AMENDED COMPLAINT against All Defendants filed by CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, AMERICAN HOSPITAL ASSOCIATION, MERCY HEALTH MUSKEGON, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, YORK HOSPITAL.(Stetson, Catherine) (Entered: 01/29/2019) |
| 02/01/2019 | 14 | MOTION for Summary Judgment by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL (Attachments: # 1 Memorandum in Support, # 2 Declaration of AHA, # 3 Declaration of AAMC, # 4 Declaration of Olympic Medical Center, # 5 Declaration of York Hospital, # 6 Declaration of Mercy Health Muskegon, # 7 Text of Proposed Order)(Stetson, Catherine) (Entered: 02/01/2019) |
| 02/01/2019 | 15 | Joint MOTION for Briefing Schedule by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL (Attachments: # 1 Text of Proposed Order)(Stetson, Catherine) (Entered: 02/01/2019) |
| 02/04/2019 | | MINUTE ORDER granting 15 Motion for Briefing Schedule. Defendant's Opposition to Motion for Summary Judgment and Motion to Dismiss shall be filed no later than March 1, 2019. Plaintiffs' Reply in Support of Motion for Summary Judgment and Opposition to Motion to Dismiss shall be filed no later than March 15, 2019. Defendant's Reply in Support of Motion to Dismiss shall be filed no later than March 29, 2019. Signed by Judge Rosemary M. Collyer on 2/4/2019. (DAS) (Entered: 02/04/2019) |
| 02/04/2019 | | Set/Reset Deadlines/Hearings: Response to Motion for Summary Judgment due by 3/1/2019. Reply to Motion for Summary Judgment due by 3/15/2019. Motion to dismiss due by 3/1/2019. Response due by 3/15/2019. Reply due by 3/29/2019. (zcdw) (Entered: 02/05/2019) |
| 02/21/2019 | 16 | MOTION for Leave to File *Amicus Curiae Brief* by AMERICA'S ESSENTIAL HOSPITALS (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Eyman, Barbara) (Entered: 02/21/2019) |
| 02/21/2019 | | MINUTE ORDER granting 16 Motion for Leave to File Amicus Curiae Brief. Signed by Judge Rosemary M. Collyer on 2/21/2019. (DAS) (Entered: 02/21/2019) |
| 02/21/2019 | 17 | AMICUS BRIEF by AMERICA'S ESSENTIAL HOSPITALS. (tth) (Entered: 02/26/2019) |
| 02/27/2019 | | MINUTE ORDER. All parties in related case numbers 18−cv−2841 and 19−cv−132 shall meet and confer and, no later than March 6, 2019, submit a proposed schedule for consolidated dispositive briefing or show good cause why such briefing should not be consolidated. The current briefing schedules in both cases are stayed pending a decision on this issue. Signed by Judge Rosemary M. Collyer on 2/27/2019. (DAS) (Entered: 02/27/2019) |

| 03/06/2019 | 18 | | RESPONSE TO ORDER OF THE COURT re Order, filed by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL. (Stetson, Catherine) (Entered: 03/06/2019) |
|---|---|---|---|
| 03/08/2019 | | | MINUTE ORDER resetting the briefing schedule after consideration of the parties' response to the Court's February 27, 2019 Minute Order. Response to Motion for Summary Judgment and Motion to Dismiss due by 3/22/2019. Reply to Motion for Summary Judgment and Opposition to Motion to Dismiss due by 4/5/2019. Reply to Motion to Dismiss due by 4/19/2019. Signed by Judge Rosemary M. Collyer on 3/8/2019. (DAS) (Entered: 03/08/2019) |
| 03/08/2019 | | | Set/Reset Deadlines/Hearings: Motion to Dismiss due by 3/22/2019. Response due by 4/5/2019. Reply due by 4/19/2019. Response to Motion for Summary Judgment due by 3/22/2019. Reply to Motion for Summary Judgment due by 4/5/2019. (zcdw) (Entered: 03/10/2019) |
| 03/09/2019 | 19 | | NOTICE of Appearance by Susan Margaret Cook on behalf of All Plaintiffs (Cook, Susan) (Entered: 03/09/2019) |
| 03/22/2019 | 20 | | MOTION to Dismiss *or, in the Alternative, Cross−Motion for Summary Judgment* by ALEX M. AZAR, II (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Humphreys, Bradley). Added MOTION for Summary Judgment on 3/25/2019 (tth). (Entered: 03/22/2019) |
| 03/22/2019 | 21 | | Memorandum in opposition to re 14 MOTION for Summary Judgment filed by ALEX M. AZAR, II. (Humphreys, Bradley) (Entered: 03/22/2019) |
| 04/05/2019 | 22 | | Memorandum in opposition to re 20 MOTION to Dismiss *or, in the Alternative, Cross−Motion for Summary Judgment* MOTION for Summary Judgment filed by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL. (Attachments: # 1 Text of Proposed Order)(Stetson, Catherine) (Entered: 04/05/2019) |
| 04/05/2019 | 23 | | REPLY to opposition to motion re 14 MOTION for Summary Judgment filed by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL. (Stetson, Catherine) (Entered: 04/05/2019) |
| 04/18/2019 | 24 | | NOTICE of Appearance by Justin Michael Sandberg on behalf of All Defendants (Sandberg, Justin) (Entered: 04/18/2019) |
| 04/19/2019 | 25 | | REPLY to opposition to motion re 20 MOTION to Dismiss *or, in the Alternative, Cross−Motion for Summary Judgment* MOTION for Summary Judgment filed by ALEX M. AZAR, II. (Humphreys, Bradley) (Entered: 04/19/2019) |
| 08/02/2019 | 26 | | Motion for Hearing by AMERICAN HOSPITAL ASSOCIATION (Stetson, Catherine); Modified event and text on 8/5/2019 (tth). (Entered: 08/02/2019) |
| 08/15/2019 | 27 | | ORDER TO SHOW CAUSE. Plaintiffs shall show cause, by August 23, 2019, why civil cases 18−2841 and 19−132 should not be consolidated for the |

| | | |
|---|---|---|
| | | purposes of decision. See Order for details. Signed by Judge Rosemary M. Collyer on 8/15/2019. (lcrmc3) (Entered: 08/15/2019) |
| 08/15/2019 | | Set/Reset Deadlines: Plaintiff Show Cause due by 8/23/2019. (mac) (Entered: 08/15/2019) |
| 08/20/2019 | 28 | RESPONSE TO ORDER OF THE COURT re 27 Order filed by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL. (Stetson, Catherine) (Entered: 08/20/2019) |
| 08/26/2019 | | MINUTE ORDER consolidating cases 18−cv−2841 and 19−cv−132 for the purposes of decision. 18−cv−2841 is the leading case. Signed by Judge Rosemary M. Collyer on 8/26/2019. (lcrmc3) (Entered: 08/26/2019) |
| 09/04/2019 | 29 | ENTERED IN ERROR.....STIPULATION of Dismissal *(Partial)* by CHARLOTTE−MECKLENBURG HOSPITAL AUTHORITY, COPLEY MEMORIAL HOSPITAL, INC., FAYETTE COMMUNITY HOSPITAL, INC., OSF HEALTHCARE SYSTEM, PIEDMONT ATHENS REGIONAL MEDICAL CENTER, INC., PIEDMONT HOSPITAL, INC., PIEDMONT MOUNTAINSIDE HOSPITAL, INC., RUSH OAK PARK HOSPITAL, INC., SCOTLAND HEALTH CARE SYSTEM. (Polston, Mark); Modified on 9/5/2019 (ztth). (Entered: 09/04/2019) |
| 09/05/2019 | | NOTICE OF ERROR re 29 Stipulation of Dismissal; emailed to mpolston@kslaw.com, cc'd 10 associated attorneys −− The PDF file you docketed contained errors: 1. Incorrect header/caption/case number, 2. Please refile document (ztth, ) (Entered: 09/05/2019) |
| 09/05/2019 | 30 | STIPULATION of Dismissal *(Partial)* by CHARLOTTE−MECKLENBURG HOSPITAL AUTHORITY, COPLEY MEMORIAL HOSPITAL, INC., FAYETTE COMMUNITY HOSPITAL, INC., OSF HEALTHCARE SYSTEM, PIEDMONT ATHENS REGIONAL MEDICAL CENTER, INC., PIEDMONT HOSPITAL, INC., PIEDMONT MOUNTAINSIDE HOSPITAL, INC., RUSH OAK PARK HOSPITAL, INC., SCOTLAND HEALTH CARE SYSTEM. (Polston, Mark) (Entered: 09/05/2019) |
| 09/10/2019 | | MINUTE ORDER accepting 30 Stipulation of Partial Dismissal Without Prejudice. Signed by Judge Rosemary M. Collyer on 9/10/2019. (lcrmc3) (Entered: 09/10/2019) |
| 09/17/2019 | 31 | MEMORANDUM OPINION. Signed by Judge Rosemary M. Collyer on 9/17/2019. (lcrmc3) (Entered: 09/17/2019) |
| 09/17/2019 | 32 | ORDER granting Plaintiffs' 14 Motion for Summary Judgment, and denying Defendant's 20 Cross−Motion for Summary Judgment. The parties shall submit a joint status report by October 1, 2019, regarding the need for additional briefing. See Order for details. Signed by Judge Rosemary M. Collyer on 9/17/2019. (lcrmc3) (Entered: 09/17/2019) |
| 09/17/2019 | | Set/Reset Deadlines/Hearings: Joint Status Report due by 10/1/2019. (zcdw) (Entered: 09/18/2019) |
| 09/17/2019 | | Set/Reset Deadlines/Hearings: Joint Status Report due by 10/1/2019. (zcdw) (Entered: 09/19/2019) |

| 09/23/2019 | 33 | | MOTION to Modify *Order* by ALEX M. AZAR, II (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 09/23/2019) |
|---|---|---|---|
| 09/30/2019 | 34 | | Memorandum in opposition to re 33 MOTION to Modify *Order* filed by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL. (Attachments: # 1 Text of Proposed Order)(Stetson, Catherine) (Entered: 09/30/2019) |
| 10/01/2019 | 35 | | Memorandum in opposition to re 33 MOTION to Modify *Order* filed by CHARLOTTE−MECKLENBURG HOSPITAL AUTHORITY, COLUMBUS REGIONAL HEALTHCARE SYSTEM, COPLEY MEMORIAL HOSPITAL, INC., EAST BATON ROUGE MEDICAL CENTER, LLC, FAYETTE COMMUNITY HOSPITAL, INC., FLORIDA HEALTH SCIENCES CENTER INC., MONTEFIORE HEALTH SYSTEM, INC.(in CA 19−132), NORTHWEST MEDICAL CENTER, OCHSNER CLINIC FOUNDATION, OSF HEALTHCARE SYSTEM, PIEDMONT ATHENS REGIONAL MEDICAL CENTER, INC., PIEDMONT HOSPITAL, INC., PIEDMONT MOUNTAINSIDE HOSPITAL, INC., PIEDMONT NEWNAN HOSPITAL, INC., RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, RUSH OAK PARK HOSPITAL, INC., RUSH UNIVERSITY MEDICAL CENTER, SARASOTA MEMORIAL HOSPITAL, SCOTLAND HEALTH CARE SYSTEM, UNIVERSITY OF KANSAS HOSPITAL AUTHORITY, VANDERBILT UNIVERSITY MEDICAL CENTER. (Polston, Mark) (Entered: 10/01/2019) |
| 10/01/2019 | 36 | | Joint STATUS REPORT by ALEX M. AZAR, II. (Humphreys, Bradley) (Entered: 10/01/2019) |
| 10/07/2019 | 37 | | REPLY to opposition re 33 MOTION to Modify *Order Re−Filed Per Advice from Clerks's Office (Filed on Monday via Email)* filed by ALEX M. AZAR, II. (Sandberg, Justin) Modified on 10/9/2019 to correct filed date (jf). (Entered: 10/09/2019) |
| 10/21/2019 | 38 | | MEMORANDUM OPINION. Signed by Judge Rosemary M. Collyer on 10/21/2019. (DAS) (Entered: 10/21/2019) |
| 10/21/2019 | 39 | | ORDER denying 33 Motion to Modify. This case is closed. Signed by Judge Rosemary M. Collyer on 10/21/2019. (DAS) (Entered: 10/21/2019) |
| 11/06/2019 | 40 | | NOTICE *of Intent to File Motion to Enforce Judgment* by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL (Attachments: # 1 Text of Proposed Order)(Cook, Susan) (Entered: 11/06/2019) |
| 11/06/2019 | 41 | | MOTION for Briefing Schedule by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL. (See Docket Entry 40 to view document) (ztth) (Entered: 11/07/2019) |
| 11/07/2019 | 42 | | RESPONSE re 41 MOTION for Briefing Schedule *and to Notice of Proposed Motion* filed by ALEX M. AZAR, II. (Sandberg, Justin) (Entered: 11/07/2019) |

| 11/11/2019 | 43 | | MOTION to Enforce Judgment by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Cook, Susan) (Entered: 11/11/2019) |
| --- | --- | --- | --- |
| 11/12/2019 | | | MINUTE ORDER setting briefing schedule. The government's opposition to Plaintiffs' 43 Motion to Enforce Judgment is due 11/25/2019. Plaintiffs' Reply is due 12/5/2019. Signed by Judge Rosemary M. Collyer on 11/12/2019. (lcrmc1) (Entered: 11/12/2019) |
| 11/12/2019 | | | Set/Reset Deadlines/Hearings: Response to 43 due by 11/25/2019. Reply due by 12/5/2019. (zcdw) (Entered: 11/13/2019) |
| 11/21/2019 | 44 | | RESPONSE re 43 MOTION to Enforce Judgment filed by CHARLOTTE–MECKLENBURG HOSPITAL AUTHORITY, COLUMBUS REGIONAL HEALTHCARE SYSTEM, COPLEY MEMORIAL HOSPITAL, INC., EAST BATON ROUGE MEDICAL CENTER, LLC, FAYETTE COMMUNITY HOSPITAL, INC., FLORIDA HEALTH SCIENCES CENTER INC., MONTEFIORE HEALTH SYSTEM, INC.(in CA 19–132), NORTHWEST MEDICAL CENTER, OCHSNER CLINIC FOUNDATION, OSF HEALTHCARE SYSTEM, PIEDMONT ATHENS REGIONAL MEDICAL CENTER, INC., PIEDMONT HOSPITAL, INC., PIEDMONT MOUNTAINSIDE HOSPITAL, INC., PIEDMONT NEWNAN HOSPITAL, INC., RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, RUSH OAK PARK HOSPITAL, INC., RUSH UNIVERSITY MEDICAL CENTER, SARASOTA MEMORIAL HOSPITAL, SCOTLAND HEALTH CARE SYSTEM, UNIVERSITY OF KANSAS HOSPITAL AUTHORITY, VANDERBILT UNIVERSITY MEDICAL CENTER. (McElvain, Joel) (Entered: 11/21/2019) |
| 11/25/2019 | 45 | | RESPONSE re 43 MOTION to Enforce Judgment filed by ALEX M. AZAR, II. (Sandberg, Justin) (Entered: 11/25/2019) |
| 12/05/2019 | 46 | | REPLY to opposition to motion re 43 MOTION to Enforce Judgment filed by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL. (Stetson, Catherine) (Entered: 12/05/2019) |
| 12/09/2019 | 47 | | NOTICE *(Supplement)* by AMERICAN HOSPITAL ASSOCIATION, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, CLALLAM COUNTY PUBLIC HOSPITAL NO. 2, MERCY HEALTH MUSKEGON, YORK HOSPITAL re 46 Reply to opposition to Motion, (Stetson, Catherine) (Entered: 12/09/2019) |
| 12/12/2019 | 48 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 38 Memorandum & Opinion, 31 Memorandum & Opinion, 32 Order, 39 Order on Motion to Modify by ALEX M. AZAR, II. Fee Status: No Fee Paid. Parties have been notified. (Humphreys, Bradley) (Entered: 12/12/2019) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:18-CV-2841-RMC |
| v. | ) ) ) | |
| ALEX M. AZAR II, in his official capacity as Secretary of Health & Human Services, | ) ) ) | |
| Defendant. | ) ) ) ) | |
| UNIVERSITY OF KANSAS HOSPITAL AUTHORITY, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:19-CV-132-RMC |
| v. | ) ) ) | |
| ALEX M. AZAR II, in his official capacity as Secretary of Health & Human Services, | ) ) ) | |
| Defendant. | ) ) ) ) | |

## NOTICE OF APPEAL

Defendant Alex M. Azar II, in his official capacity as Secretary of Health and Human Services, hereby gives notice in the above-captioned cases that he appeals to the United States Court of Appeals for the District of Columbia Circuit from all aspects of this Court's October 21, 2019 final appealable order, ECF No. 39; the accompanying memorandum opinion, ECF No. 38; the Court's September 17, 2019 order, ECF No. 32; the accompanying memorandum opinion, ECF No. 31; and all prior orders and decisions that merge into these orders.

Dated: December 12, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
JUSTIN SANDBERG
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-0878
Fax: (202) 616-8470
Bradley.Humphreys@usdoj.gov
Justin.Sandberg@usdoj.gov

*Counsel for Defendant*

|  |  |  |
|---|---|---|
| **AMERICAN HOSPITAL ASSOCIATION**, *et al.*, | ) ) ) |  |
|  | ) |  |
| **Plaintiffs,** | ) |  |
|  | ) |  |
| v. | ) | **Civil Action No. 18-2841 (RMC)** |
|  | ) |  |
| **ALEX M. AZAR II,** **Secretary of the Department of Health and Human Services,** | ) ) ) |  |
|  | ) |  |
| **Defendant.** | ) |  |
|  | ) |  |

## MEMORANDUM OPINION

Under Medicare Part B, the Centers for Medicare & Medicaid Services (CMS) pays hospital outpatient departments at predetermined rates for patient services, and Congress has established the Outpatient Prospective Payment System by which CMS is to set and pay those rates. CMS came to believe that the rate for certain clinic-visit services at a specific subset of these outpatient departments—familiarly, off-campus provider-based departments—was too high and that patients could receive similar services from free-standing physician offices at lower cost to the government and to taxpayers. Accordingly, CMS promulgated a rule in 2018 lowering the payment rate for clinic-visit services at off-campus provider-based departments to match the rate for similar services at physician offices, in order to shift patients towards the latter.

Plaintiffs are hospital organizations which have seen their payment rates cut. They argue that the method by which CMS has cut their rates has no place in the statutory scheme established by Congress, and further that Congress has already decided as a matter of policy and practicality that off-campus provider-based departments should be paid at *higher* rates

1

than physician offices for similar services. In short, Plaintiffs argue that CMS' 2018 rule is *ultra vires*. CMS opposes. Both parties move for summary judgment.

The Court has given close attention to the parties' arguments and the statutory scheme, which, as relevant, is both simple and detailed. For the reasons below, the Court finds that CMS exceeded its statutory authority when it cut the payment rate for clinic services at off-campus provider-based clinics. The Court will grant Plaintiffs' motion, deny CMS' cross-motion, vacate the rule, and remand.

## I. BACKGROUND

The Medicare program, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, provides federally funded medical insurance to the elderly and disabled. Medicare Part A addresses insurance coverage for inpatient hospital care, home health care, and hospice services. *Id.* § 1395c. Medicare Part B addresses supplemental coverage for other types of care, including outpatient hospital care. *Id.* §§ 1395j, 1395k.

### A. The Outpatient Prospective Payment System

Under Medicare Part B, CMS directly reimburses hospital outpatient departments for providing outpatient department (OPD) services to Medicare beneficiaries, which payments are made through the elaborate Outpatient Prospective Payment System (occasionally, OPPS). *See generally* 42 U.S.C. § 1395*l*(t). Implemented as part of the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, the Outpatient Prospective Payment System does not reimburse hospitals for their actual costs of providing OPD services. Rather, as with Medicare generally and in an effort to control costs, the Outpatient Prospective Payment System pays for OPD services at pre-determined rates. *See Amgen, Inc. v. Smith*, 357 F.3d 103, 106 (D.C. Cir. 2004). Those payment rates are determined as follows: OPD services which are clinically comparable or which require similar resource usage are grouped together and assigned an

2

Ambulatory Payment Classification (occasionally, APC). 42 U.S.C. § 1395*l*(t)(2)(B). A formula is used to calculate the relative payment weight of each Ambulatory Payment Classification against other APCs, based on the average cost of providing OPD services in previous years. *See id.* § 1395*l*(t)(2)(C). Each Ambulatory Payment Classification's relative payment weight is then multiplied by an Outpatient Prospective Payment System "conversion factor"—which is the same for, and applies uniformly to, all APCs—to reach the fee schedule amount for each APC. *Id.* § 1395*l*(t)(3)(D). Ultimately, the actual amount paid to the hospital is the calculated fee schedule amount adjusted for regional wages, transitional pass-through payments, outlier costs, "and other adjustments as determined to be necessary to ensure equitable payments, such as adjustments for certain classes of hospitals," *id.* § 1395*l*(t)(2)(D)-(E), less an applicable deductible and modified by a "payment proportion." *See id.* § 1395*l*(t)(4).

Every year, CMS must review the groups, relative payment weights, and wage and other adjustments for each Ambulatory Payment Classification to account for changes in medical practice or technology, new services, new cost data, and other relevant information and factors. *Id.* § 1395*l*(t)(9)(A). This annual review is conducted with an important caveat: any adjustment to the groups, relative payment weights, or adjustments must be budget neutral, meaning that it cannot cause a change in CMS' estimated expenditures for OPD services for the year. *See id.* § 1395*l*(t)(9)(B); *cf. id.* § 1395*l*(t)(9)(D)-(E) (requiring initial wage, outlier, and other adjustments also be budget neutral). Thus, decreases or increases in spending caused by one adjustment must be offset with increases or decreases in spending by another.

CMS must also update annually the Outpatient Prospective Payment System conversion factor, generally to account for the inflation rate for the cost of medical services, *see id.* § 1395*l*(t)(3)(C)(iv), but sometimes for other reasons, as discussed below. Unlike

3

adjustments to Ambulatory Payment Classifications under paragraph (t)(9)(A), adjustments to the conversion factor do *not* need to be budget neutral. *See generally id.* § 1395*l*(t)(3)(C) (describing conversion factor inputs). However, because the same conversion factor applies equally to all Ambulatory Payment Classifications, adjustments to the conversion factor cannot be used to change the fee schedule for specific APCs. In other words, changes to the conversion factor affect total spending and not spending on specific services.

The Outpatient Prospective Payment System controls overall costs by incentivizing hospital outpatient departments to provide OPD services at or below the average cost for such services. That said, while the Outpatient Prospective Payment System limits the amount Medicare will pay for each service, it does not limit the volume or mix of services provided to a patient. Concerned that fee schedule limits would not adequately limit increases in overall expenditures, Congress included as part of the Outpatient Prospective Payment System two provisions at issue here. Under paragraph (t)(2)(F), "the Secretary shall develop a method for controlling unnecessary increases in the volume of covered OPD services." *Id.* § 1395*l*(t)(2)(F). Further, under paragraph (t)(9)(C), "[i]f the Secretary determines under methodologies described in paragraph (2)(F) that the volume of services paid for under this subsection increased beyond amounts established through those methodologies, the Secretary may appropriately adjust the update to the conversion factor otherwise applicable in a subsequent year." *Id.* § 1395*l*(t)(9)(C).

## B. Off-Campus Provider-Based Departments, Physician Offices, and the Bipartisan Budget Act of 2015

Many medical services that were once only offered in an inpatient hospital setting can now be provided by hospital outpatient departments whereby the patient does not spend the night. Medicare traditionally welcomed these cheaper alternatives to inpatient care and, to meet

4

the growing demand for these services, some hospitals have established off-campus provider-based departments (occasionally, PBDs), which are outpatient departments at facilities separated by a specific distance (or more) from the physical campus of the hospital with which they are affiliated. *See* 42 C.F.R. § 413.65(e). Although not physically proximate to their affiliated hospital's main campus,[1] off-campus provider-based departments are so closely integrated into the same system that they are considered part of the hospital itself. This allows off-campus provider-based departments to offer more comprehensive services to their patients but also subjects off-campus provider-based departments to the same regulatory requirements as the main hospital. *See* 42 C.F.R. § 413.65 (describing regulatory requirements for off-campus provider-based departments). Because they are part of the same system and face the same regulatory requirements and regulatory costs as hospitals, off-campus provider-based departments have generally been paid at the same rates hospitals are paid for OPD services.[2]

That said, some comparable outpatient medical services can also be provided by free-standing physician offices, which are medical practices not integrated with, or part of, a hospital. *See* 42 C.F.R. § 413.65(a)(2). While physician offices do not provide the same array of services as off-campus provider-based departments, they also do not bear the same regulatory requirements and costs as hospitals. Accordingly, CMS pays physician offices for outpatient medical services according to the lower-paying Medicare Physician Fee Schedule instead of the Outpatient Prospective Payment System. As relevant to this case, in 2017 the Outpatient Prospective Payment System rate for the most voluminous OPD service provided by off-campus

---

[1] For example, an off-campus provider-based department may be located away from the main hospital because of space constraints at the main campus, or because the hospital wants to have an affiliated facility in a different (oftentimes underserved) neighborhood.

[2] Not all are paid the same amounts, for reasons described below.

provider-based departments, "evaluation and management of a patient" (E&M),[3] was \$184.44 for new patients and \$109.46 for established patients while the Physician Fee Schedule rate for the comparable service at a physician office was \$109.46 for a new patient and \$73.93 for an established patient.  *See* 83 Fed. Reg. 37,046, 37,142 (July 31, 2018) (Proposed Rule).

        Until 2015, all off-campus provider-based departments were paid according to the Outpatient Prospective Payment System.  At that time, the volume of OPD services had increased by 47 percent over the decade ending in calendar year 2015 and, in the five years from 2011 to 2016, combined program spending and beneficiary cost-sharing (*i.e.*, co-payments) rose by 51 percent, from \$39.8 billion to \$60.0 billion.  *See* Proposed Rule at 37,140.  There are many possible explanations for this increase.  For one, the Medicare-eligible population grew substantially during the same time period.  *See* Medicare Board of Trustees, 2018 Annual Report of the Board of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds 181 (2018), *available at* https://go.cms.gov/2m5ZCok.  For another, advances in medical technology shifted services from inpatient settings to outpatient settings. *See* Ken Abrams, Andreea Balan-Cohen & Priyanshi Durbha, Growth in Outpatient Care, Deloitte (Aug. 15, 2018), *available at* https://bit.ly/2nOkG05.

        However, the Medicare Payment Advisory Commission (MedPAC), an independent congressional agency which advises Congress on issues related to Medicare, long believed that another major reason for this increase was the financial incentive created by the Outpatient Prospective Payment System compared to the Physician Fee Schedule.  *See* MedPAC, Report to the Congress:  Medicare Payment Policy 69-70 (Mar. 2017).  That is, because off-

---

[3] Technically, E&M services fall under Healthcare Common Procedure Coding System (HCPCS) code G0463, billed under APC 5012 (Clinic Visits and Related Services).

campus provider-based departments are paid at higher rates than physician offices, MedPAC advised that hospitals were buying existing physician offices and converting them into off-campus provider-based departments, sometimes without a change of location or patients, unnecessarily causing CMS to incur higher costs. *See id.* To combat this trend, MedPAC repeatedly recommended that Congress authorize CMS to equalize payment rates under both the Outpatient Prospective Payment System and Physician Fee Schedule for certain services, including E&M services, at all off-campus provider-based departments. *See id.* at 70-71; *see also id.* at 69 ("One-third of the growth in outpatient volume from 2014 to 2015 was due to an increase in the number of evaluation and management (E&M) visits billed as outpatient services."). Hospitals responded by advising Congress that MedPAC's recommendation ignored the higher costs required to operate a hospital and would force some existing off-campus provider-based departments, which relied on the rates set by the Outpatient Prospective Payment System, to reduce their services or close completely. *See, e.g.*, Letter from Atul Grover, Chief Pub. Policy Officer, Ass'n of Am. Med. Colls., to The Hon. John Barrasso, *et al*. (Jan. 13, 2012), *available at* http://bit.ly/2LVEXOT.

Congress ended the debate, at least momentarily, when it adopted Section 603 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 603, 129 Stat. 584, 597 (2015). That 2015 statute neither equalized payment rates for physicians offices and off-campus provider-based departments, as MedPAC had recommended, nor left the Outpatient Prospective Payment System untouched, as the hospitals requested. Instead, Congress chose a middle path: Off-campus provider-based departments that were billing under the Outpatient Prospective Payment System as of November 2, 2015 (now "excepted off-campus PBDs") were permitted to continue that practice. *See* 42 U.S.C. § 1395*l*(t)(21)(B)(ii). However, off-campus provider-based

departments which were not billing under the Outpatient Prospective Payment System as of November 2, 2015, *i.e.*, *new* off-campus provider-based departments (or "nonexcepted off-campus PBDs"), would be paid according to a different rate system to be selected by CMS. *See id.* § 1395*l*(t)(21)(C). In practice, CMS continues to pay nonexcepted off-campus PBDs under the Outpatient Prospective Payment System but applies a "[Physician Fee Schedule] Relativity Adjustor" which approximates the rate the operative Physician Fee Schedule would have paid. *See* 81 Fed. Reg. 79,562, 79,726 (Nov. 14, 2016).

### C. The Final Rule and Plaintiffs' Challenge

Despite these changes, the volume of OPD services provided by excepted off-campus provider-based departments grew. When Congress passed the Bipartisan Budget Act of 2015, expenditures by the Outpatient Prospective Payment System were approximately \$56 billion and increasing at an annual rate of about 7.3 percent, with the volume and intensity of outpatient services increasing by 3.5 percent. *See* Proposed Rule at 37,139. In 2018, CMS estimated that, without intervention, expenditures in 2019 would rise to \$75 billion (an increase of 8.1 percent over 2018), with the volume and intensity increasing by 5.3 percent. *See id.* at 37,139.

CMS thus proposed to implement a "method for controlling unnecessary increases in the volume of covered OPD services." *See generally id.* at 37,138-143; *cf.* 42 U.S.C. § 1395*l*(t)(2)(F). Specifically, CMS determined that many of the E&M services provided by off-campus provider-based departments were "unnecessary increases in the volume of outpatient department services." Such services were not deemed *medically* "unnecessary" but *financially* "unnecessary" because "these services could likely be safely provided in a lower cost setting,"

8

*i.e.*, at physician offices.[4]  Proposed Rule at 37,142.  More specifically, CMS determined that the growth of E&M services provided by off-campus provider-based departments was due to the higher payment rate available to excepted off-campus provider-based departments under the Outpatient Prospective Payment System.  *Id.*  CMS proposed to solve its financial problem by applying the corresponding Physician Fee Schedule rate for E&M services to excepted off-campus PBDs, thereby equalizing the payment rate for E&M services provided by excepted off-campus PBDs, nonexcepted off-campus PBDs, and physician offices alike.  *Id.* at 37,142.

CMS also determined that it could not control the volume of financially "unnecessary" OPD services in a budget-neutral fashion, since this would "simply shift the movement of the volume within the OPPS system in the aggregate."  *Id.* at 37,143.  Therefore, CMS proposed to implement its new approach in a *non*-budget-neutral manner, asserting that the budget neutrality requirements of paragraphs (t)(2)(D)-(E) and (t)(9)(B) do not apply to "methods" developed under paragraph (t)(2)(F) and that its new approach constituted such a method.  *Id.*  CMS estimated that this approach would save approximately $610 million in 2019 alone.  *Id.*

CMS received almost 3,000 comments on the Proposed Rule, many of which argued that CMS lacked statutory authority to implement the proposed method.  Nonetheless, on November 21, 2018, CMS issued a Final Rule implementing the proposed method effective

---

[4] As a general matter, CMS uses expenditures over targeted levels to measure "unnecessary" increases in the volume of OPD services, albeit not without criticism. *See, e.g.*, 63 Fed. Reg. 47,552, 47,586 (Sept. 8, 1998) ("[W]e are examining a number of mechanisms to control unnecessary increases, as reflected by expenditure levels, in the volume of covered outpatient department services."); 65 Fed. Reg. 18,434, 18,503 (Apr. 7, 2000) ("Others argued that an expenditure target is not a reliable way to distinguish the growth of necessary versus unnecessary services."); 66 Fed. Reg. 44,672, 44,707 (Aug. 24, 2001) (noting MedPAC's recommendation that CMS "not use an expenditure target to update the conversion factor").

January 1, 2019. *See generally Medicare Program: Changes to Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs*, 83 Fed. Reg. 58,818, 59,004-15 (Nov. 21, 2018) (Final Rule). The only substantive change between the Proposed Rule and the Final Rule was that implementation of the full E&M rate cut was staggered over two years, saving an estimated $300 million in 2019, with additional savings subsequent. *Id.* at 59,004.

Plaintiffs are hospital organizations and related trade groups that have provided services with payment rates affected by the Final Rule, have submitted claims for payment by Medicare, and have appealed determinations on those claims to CMS. The Defendant is Alex M. Azar, in his official capacity as the Secretary of the Department of Health and Human Services. Plaintiffs argue that the Final Rule is contrary to both the Medicare statutory scheme and the policy decision reached by Congress under Section 603 of the Bipartisan Budget Act of 2015 and is therefore *ultra vires*. Both parties have moved for summary judgment; the matter is now ripe.[5]

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "In a case involving review of a final agency action under the Administrative Procedure Act, however, the standard set forth in Rule 56[] does

---

[5] On August 26, 2019, the Court consolidated two cases challenging the same Final Rule: *Am. Hosp. Ass'n v. Azar*, No. 18-2841 (RMC), and *Univ. of Kansas Hosp. Auth. v. Azar*, No. 19-132 (RMC). *See* 8/26/2019 Minute Order. Although each set of plaintiffs asserts a different legal vehicle to bring their claim—non-statutory review and APA review, respectively—both challenge the same Final Rule on purely legal grounds with largely overlapping, and not inconsistent, legal arguments. Both legal theories are addressed herein.

not apply because of the limited role of a court in reviewing the administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) (internal citation omitted); *see also Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012). Under the APA, the agency's role is to resolve factual issues to reach a decision supported by the administrative record, while "'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

Plaintiffs' argument that the Secretary acted *ultra vires* is premised on three basic tenets of administrative law. First, "an agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see also Transohio Sav. Bank v. Dir.*, *Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992). Second, agency actions beyond delegated authority are *ultra vires* and should be invalidated. *Transohio*, 967 F.2d at 621. Third, courts look to an agency's enabling statute and subsequent legislation to determine whether the agency has acted within the bounds of its authority. *Univ. of D.C. Faculty Ass'n/NEA v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 620-21 (D.C. Cir. 1998) (explaining that *ultra vires* claims require courts to review the relevant statutory materials to determine whether "Congress intended the [agency] to have the power that it exercised when it [acted]").

11

When reviewing an agency's interpretation of its enabling statute and the laws it administers, courts are guided by "the principles of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007) (internal citations omitted). *Chevron* sets forth a two-step inquiry. The initial question is whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 843. If so, then "that is the end of the matter" because both courts and agencies "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. To decide whether Congress has addressed the precise question at issue, a reviewing court applies "'the traditional tools of statutory construction.'" *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 487 (D.C. Cir. 2007) (quoting *Chevron*, 467 U.S. at 843 n.9). It analyzes "the text, structure, and the overall statutory scheme, as well as the problem Congress sought to solve." *Id.* (citing *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004); *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002)). When the statute is clear, the text controls and no deference is extended to an agency's interpretation in conflict with the text. *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011).

If the statute is ambiguous or silent on an issue, a court proceeds to the second step of the *Chevron* analysis and determines whether the agency's interpretation is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843; *Sherley v. Sebelius*, 644 F.3d 388, 393-94 (D.C. Cir. 2011). Under *Chevron* Step Two, a court determines the level of deference due to the agency's interpretation of the law it administers. *See Mount Royal Joint Venture*, 477 F.3d at 754. Where, as here, "an agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, [courts] give the agency's interpretation *Chevron* deference." *Id.* at 754 (citing *United States v. Mead Corp.*, 533 U.S. 218,

12

230-31 (2001)).  That is, an agency's interpretation that is permissible and reasonable receives controlling weight,[6] *id.*, "even if the agency's reading differs from what the court believes is the best statutory interpretation," *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  Such broad deference is particularly warranted when the regulations at issue "concern[] a complex and highly technical regulatory program."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks and citation omitted).

## III.   ANALYSIS

### A. Reviewability

The government contends that this Court lacks jurisdiction to review the Final Rule under the APA because Congress has precluded judicial review of the development of the Outpatient Prospective Payment System, including its methods and adjustments, and because Plaintiffs have failed to exhaust their administrative remedies under the Medicare statute.

#### 1.  Preclusion of Judicial Review

Agency action is subject to judicial review under the APA unless the statute precludes review, or the agency action is committed to agency discretion by law.  *See COMSAT Crop. v. FCC*, 114 F.3d 223, 226 (D.C. Cir. 1997) (citing 5 U.S.C. § 701(a)).  The statute specifies one such limitation:

> There shall be *no administrative or judicial review* under section 1395ff of this title, 1395oo of this title, or otherwise *of*—
>
> (A) the development of the classification system under paragraph (2), including the establishment of groups and relative payment weights for covered OPD services, of wage adjustment factors, other adjustments, and *methods described in paragraph (2)(F)*.

---

[6] An interpretation is permissible and reasonable if it is not arbitrary, capricious, or manifestly contrary to the statute.  *Mount Royal Joint Venture*, 477 F.3d at 754.

42 U.S.C. § 1395*l*(t)(12)(A) (emphasis added). The government argues here that the Final Rule imposed a rate cut as a "method" developed under paragraph (t)(2)(F) and so court review is barred. *Cf. id.* § 1395*l*(t)(2)(F) ("[T]he Secretary shall develop a method for controlling unnecessary increases in the volume of covered OPD services.").

Despite the bar against Medicare review in some contexts, "[t]here is a strong presumption that Congress intends judicial review of administrative action, and it can only be overcome by a clear and convincing evidence that Congress intended to preclude the suit." *Amgen*, 357 F.3d at 111 (internal citations and quotations omitted). "The presumption is particularly strong that Congress intends judicial review of agency action taken in excess of delegated authority." *Id.* "Such review is favored . . . 'if the wording of a preclusion clause is less than absolute.'" *Id.* (quoting *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988)). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 346 (1984).

Applied to this case, paragraph (t)(12)(A) plainly shields a "method" to control volume in outpatient departments from judicial review. To determine whether that shield applies, though, the Court must ascertain, consistent with Plaintiffs' *ultra vires* claims, whether what CMS calls a "method" satisfies the statute. That is, CMS cannot shield any action from judicial review merely by calling it a "method," even if it is not that. Accordingly, "the determination of whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action, and the court must address the merits to the extent necessary to determine whether the challenged agency action falls within the scope of the

preclusion on judicial review." *Id.* at 113; *see also COMSAT*, 114 F.3d at 227 ("The no-review provision . . . merges consideration of the legality of the [agency's] action with consideration of this court's jurisdiction in cases in which the challenge to the [agency's] action raises the question of the [agency's] authority to enact a particular amendment."). Because, as explained below, the Court finds that CMS' action here does not constitute a "method" within the meaning of the statute, the Court also finds that paragraph (t)(12)(A) does not preclude judicial review of Plaintiffs' claims.[7]

### 2. Exhaustion

As argued by the government, Section 405(g) of the Medicare statute requires a plaintiff to obtain administrative review of its claims before filing suit in court. *See* 42 U.S.C. § 405(g); *see also Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018) (describing the Medicare statute channeling provisions). Specifically, Section 405(g) has two requirements: (1) "presentment" of the claim; and (2) exhaustion of administrative remedies. *See Am. Hosp. Ass'n*, 895 F.3d at 825-26. The government does not substantially argue that Plaintiffs have failed to present their claim. But the government does argue that Plaintiffs have not fully availed themselves of the administrative review process. Plaintiffs concede that they have not exhausted their administrative remedies fully but argue that the requirement of exhaustion should be waived because further administrative review would be futile.

---

[7] Certain plaintiffs argue that they may bring a non-statutory *ultra vires* claim, even if review under the APA is precluded. *See* Reply in Supp. of Pls.' Mot. for Summ. J. [Dkt. 25] at 11-14. True, "the case law in this circuit is clear that judicial review is available when an agency acts *ultra vires*." *Aid Ass'n for Luterans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir 2003). But non-statutory claims may also be precluded and the standard for determining whether non-statutory review is limited is the same as under the APA. *See Dart*, 848 F.2d at 221 ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review . . . is favored when an agency is charged with acting beyond its authority."). Thus, the analysis and outcome are the same.

"Futility may serve as a ground for excusing exhaustion, either on its own or in conjunction with other factors." *Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*, 77 F. Supp. 3d 103, 110 (D.D.C. 2015) (citing *Tataranowicz v. Sullivan*, 959 F.2d 268, 274 (D.C. Cir. 1992)). Futility applies where exhaustion would be "clearly useless," such as where the agency "has indicated that it does not have jurisdiction over the dispute, or because it has evidenced a strong stand on the issue in question and an unwillingness to reconsider the issue." *Randolph-Sheppard Vendors v. Weinberger*, 795 F.2d 90, 106 (D.C. Cir. 1986). That said, the ordinary standard for futility in administrative law cases is inapplicable in Medicare cases. *See Weinberger v. Salfi*, 422 U.S. 749, 766 (1975) (stating that § 405(g) is "more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility"). In the context of Medicare, courts also look to whether "judicial resolution of the issue will interfere with the agency's efficient functioning, deny the agency the ability to self-correct, or deprive the Court of the benefits of the agency's expertise and an adequate factual record." *Nat'l Ass'n for Home Care & Hospice*, 77 F. Supp. 3d at 111 (citing *Tataranowicz*, 959 F.2d at 275); *see also Am. Hosp. Ass'n v. Azar*, 348 F. Supp. 3d 72, 75 (D.D.C. 2018), *appeal docketed*, No. 19-5048 (D.C. Cir. Feb. 28 2019).

Consideration of these factors makes clear that requiring Plaintiffs to exhaust their administrative remedies here would be a "wholly formalistic" exercise in futility. *Tataranowicz*, 959 F.2d at 274. The government does not argue that further administrative review is necessary for the agency's efficient functioning. Nor does the government argue that administrative review will give the agency the opportunity to self-correct. To the contrary, CMS' interpretation here is "even more embedded" since it was promulgated through notice-and-comment rulemaking whereby CMS has already considered and rejected Plaintiffs' specific arguments. *Nat'l Ass'n for*

16

*Home Care & Hospice*, 77 F. Supp. 3d at 112; Final Rule at 59,011-13.  Finally, additional administrative review would do nothing to develop the factual record or provide the Court with further benefits of agency expertise, since this case concerns a purely legal challenge to the scope of the Secretary's statutory authority.  *See Hall v. Sebelius*, 689 F. Supp. 2d 10, 23-24 (D.D.C. 2009) ("[E]xhaustion may be excused where an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law." (internal quotations omitted)). Indeed, it does not appear that further expertise can be brought to bear since no administrative review body has the authority to override CMS' binding regulations.  *See* 42 C.F.R. § 405.1063(a) ("All laws and regulations pertaining to the Medicare and Medicaid programs . . . are binding on ALJs and attorney adjudicators, and the [Medicare Appeals] Council."); *see, e.g.*, Noridian Healthcare Solutions, *G0463 Has No Appeal Rights* (Mar. 22, 2019), *available at* http://bit.ly/2K2Yw4W ("CMS has provided direction to the Medicare Administrative Contractors (MACs) to dismiss requests appealing the reimbursement of HCPCS G0463.  No further appeal rights will be granted at subsequent levels due to the statutory guidance supporting the pricing of this HCPCS code.").  In short, the government "gives no reason to believe that the agency machinery might accede to plaintiffs' claims," even as it recites the formal steps involved in administrative review.  *Tataranowicz*, 959 F.2d at 274.

### B.  The Outpatient Prospective Payment System Statutory Scheme

Plaintiffs argue that if CMS wants to reduce the payment rate for a particular OPD service, it must change the relative payment weights and adjustments through the annual review process, *see* 42 U.S.C. § 1395*l*(t)(9)(A), in a budget neutral manner, *see id.* § 1395*l*(t)(9)(B). Alternatively, if CMS wants to reduce Medicare costs by addressing "unnecessary increases in the volume of services," it must first develop a method to do so, *id.* § 1395*l*(t)(2)(F), which it may then implement across-the-board by adjusting the conversion factor, *see id.*

§ 1395*l*(t)(9)(C). This statutory scheme, Plaintiffs argue, is intended to prevent exactly what happened here: a selective cut to Medicare funding which targets only certain services and providers.

The government responds that CMS has authority to "develop a method for controlling unnecessary increases" in volume under paragraph (t)(2)(F) and that this authority is independent of its authority under paragraph (t)(9)(C) to adjust the conversion factor. It argues that these two actions are different and independent cost-control tools in its regulatory belt. Further, the government argues that CMS may develop a "method" to set payment rates for a particular service which is causing an "unnecessary" increase in cost (and volume) without regard to budget neutrality, because there is no logical reason Congress would want CMS to penalize all outpatient departments—by reducing rates for all OPD services—for the spike in volume (as measured by total expenditures) if only one such service caused the spike.

The government emphasizes that "method" is not explicitly defined in the statute and argues that its approach satisfies generic definitions of the term. *See, e.g.*, *Method*, Black's Law Dictionary (11th ed. 2019) ("A mode of organizing, operating, or performing something, esp. to achieve a goal."). But "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regulatory Grp.*, 573 U.S. at 321 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "A statutory 'provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'" *Id.* (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd*., 484 U.S. 365, 371 (1988)); *see also King v. Burwell*, 135 S. Ct. 2480, 2483 (2015) ("[O]ftentimes the meaning—or ambiguity—of

certain words or phrases may only become evident when placed in context.").  As such, the Court must "read the words 'in their context and with a view to their place in the overall statutory scheme.'"  *King*, 135 S. Ct. at 2483 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)); *see also Util. Air Regulatory Grp.*, 573 U.S. at 320.  That context does not make clear what a "method" is, but it does make clear what a "method" is *not*: it is not a price-setting tool, and the government's effort to wield it in such a manner is manifestly inconsistent with the statutory scheme.  There are two reasons.

*First*, Congress established an elaborate statutory scheme which spelled out each step for determining the amount of payment for OPD services under the Outpatient Prospective Payment System.  As detailed in 42 U.S.C. § 1395*l*(t)(4), titled "Medicare payment amount," the amount paid "is determined" by:  the fee schedule amount "computed under paragraph (3)(D)" for the OPD service's Ambulatory Payment Classification, adjusted for wages and other factors "as computed under paragraphs (2)(D) and (2)(E)," *see* 42 U.S.C. § 1395*l*(t)(4)(A); less applicable deductibles under § 1395*l*(b), *see id.* § 1395*l*(t)(4)(B); and modified by a "payment proportion," *see id.* § 1395*l*(t)(4)(C).  The applicable deductible and "payment proportion" are fixed by statute and are not relevant to this case, but the Ambulatory Payment Classification fee schedule amount is.  That amount is the product of the conversion factor "computed under subparagraph [(3)(C)]" and the relative payment weight for the Ambulatory Payment Classification "determined under paragraph (2)(C)."  *See id.* § 1395*l*(t)(3)(D).  The base ingredients of an Outpatient Prospective Payment System payment over which CMS has discretion are, therefore, the Ambulatory Payment Classification groups and relative payment weights; the conversion factor; and the wage adjustment and other adjustments.

19

The Court recounts these cross-referencing provisions—even the irrelevant ones—to make one thing clear: nowhere is a "method" developed under paragraph (t)(2)(F) referenced. CMS cannot shoehorn a "method" into the multi-faceted congressional payment scheme when Congress's clear directions lack any such reference. *See Util. Air Regulatory Grp.*, 573 U.S. at 328. ("We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."). As such, if CMS wishes to reduce Outpatient Prospective Payment System payments for E&M services, it must make budget-neutral adjustments to either that service's relative payment weight or to other adjustments under paragraph (t)(9)(A). Alternatively, CMS may update the conversion factor to apply across-the-board cuts under paragraph (t)(9)(C). But nothing in the adjustment or payment scheme permits service-specific, non-budget-neutral cuts.

CMS apparently understood this limitation when it considered other "methods" in the past. For example, when the Outpatient Prospective Payment System was first being developed in 1998, CMS evaluated three possible methods of volume control, all based on the Sustainable Growth Rate formula which was enacted by Congress to control the growth of "physician services" under, ironically, the Physician Fee Schedule, which is itself also a prospective payment system. *See* 63 Fed. Reg. at 47,586. Much like payment rates for OPD services under the Outpatient Prospective Payment System, payment rates for physician services are prospectively set through a combination of relative resource use, regional adjustments, and an across-the-board Physician Fee Schedule conversion factor. The Sustainable Growth Rate formula set overall target expenditure levels for physician services based on changes in enrollment, changes in physician fees, changes in the legal and regulatory landscape, and total economic growth, and then manipulated the Physician Fee Schedule conversion factor to achieve

20

that targeted level. Two of CMS' proposals in 1998 would have modified the Sustainable Growth Rate formula to also account for a measure of OPD service efficiency as well, while the third proposal would have developed a similar, independent formula for the Outpatient Prospective Payment System. All three proposals would have operated through updates to the relevant conversion factors under paragraph (t)(9)(C).[8] *Id.* at 47,586-87. None of these methods, based upon a conversion factor calculated using a Sustainable Growth Rate formula, was implemented. *See* Final Rule at 59,005.

Instead, CMS considered and implemented a different method of volume control known as "packaging," whereby "ancillary services associated with a significant procedure" are "packaged into a single payment for the procedure." 72 Fed. Reg. 66,580, 66,610 (Nov. 27, 2007); *see also* Final Rule at 58,854 ("Because packaging encourages efficiency and is an essential component of a prospective payment system, packaging . . . has been a fundamental part of OPPS since its implementation in August 2000."). Packaging incentivizes providers "to furnish services in the most efficient way by enabling hospitals to manage their resources with maximum flexibility, thereby encouraging long-term cost containment." 72 Fed. Reg. at 66,611; *see also* 63 Fed. Reg. at 47,586 ("We believe that greater packaging of these services might provide volume control."); 79 Fed. Reg. 66,770, 66,798-99 (Nov. 10, 2014) (introducing conceptually similar "comprehensive APCs"). Unlike the proposed methods based on a Sustainable Growth Rate formula that were considered in 1998, packaging does not control

---

[8] Plaintiffs argue that here CMS acknowledged "possible legislative modification" would be necessary to implement any method other than adjustment to the conversion factor. *See* Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. [Dkt. 14-1] at 15; *see also* 63 Fed. Reg. at 47,586. As noted in the text, all three "methods" proposed in 1998 would have adjusted the conversion factor. Possible legislative modification was discussed because, for two of the proposed methods, CMS did not itself have the authority to modify the Sustainable Growth Rate, which Congress implemented by statute. *See* 42 U.S.C. 1395w-4(f) (1999)).

21

volume by changing the conversion factor and thereby obviates the need to rely on paragraph (t)(9)(C), and packaging is implemented in a budget neutral manner. *See, e.g.*, 72 Fed. Reg. at 66,615 ("Because the OPPS is a budget neutral payment system[,] . . . the effects of the packaging changes we proposed resulted in changes to scaled weights and . . . to the proposed payments rates for all separately paid procedures."); *cf.* 42 U.S.C. § 1395*l*(t)(9)(A)-(B).

This history makes it clear that CMS can adopt volume-control methods under paragraph (t)(2)(F) which affect payment rates indirectly, even if those methods cannot affect them directly. Moreover, it demonstrates that the Court's interpretation does not render paragraph (t)(2)(F) mere surplusage, since some methods do not depend on manipulation of the conversion factor.

*Second*, Congress provided great detail in directing how CMS should develop and adjust relative payment weights. For example, Congress required that the initial relative payment weights for OPD services be rooted in verifiable data and cost reports. *Id.* § 1395*l*(t)(2)(C). Congress also required CMS to develop a wage adjustment attributable to geographic labor and labor-related costs, *id.* § 1395*l*(t)(2)(D); an outlier adjustment to reimburse hospitals for particularly expensive patients, *id.* § 1395*l*(t)(2)(E) and (t)(5) (detailing further the outlier adjustment); a transitional pass-through payment scheme for innovative medical devices, drugs, and biologicals, *id.* § 1395*l*(t)(2)(E) and (t)(6) (detailing further the pass-through adjustment); and catch-all "other adjustments as determined to be necessary to ensure equitable payments," *id.* § 1395*l*(t)(2)(E). This extraordinarily detailed scheme results in a relative payment system which ensures that payments for one service are rationally connected to the payments for another and satisfies specific policies considered by Congress. And so that this system retains its integrity, CMS is required to review annually the relative payment weights of

OPD services and their adjustments based on changes in cost data, medical practices and technology, and other relevant information. *See id*. § 1395*l*(t)(9)(A). Further, CMS is required to consult with "an expert outside advisory panel" to ensure the "clinical integrity of the groups and weights." *Id.*

Congress also required that adjustments to the Outpatient Prospective Payment System be made in a budget-neutral fashion (with specified exceptions). Congress itself set the first conversion factor so that the estimated expenditures for the first year of payments under the Outpatient Prospective Payment System would match estimated expenditures for the same year under the previous system. *Id.* § 1395*l*(t)(3)(C)(i). Congress further specified that the wage adjustment, outlier adjustment, pass-through adjustment, and the "other adjustments" all be budget neutral. *Id.* § 1395*l*(t)(2)(D)-(E). And Congress directed CMS to make any changes to the groups, their relative payment weights, or the adjustments resulting from its mandatory annual review in a budget-neutral fashion. *Id.* § 1395*l*(t)(9)(B).

Notwithstanding this granularity in the statute, CMS posits that in a single sentence Congress granted it parallel authority to set payment rates in its discretion that are neither relative nor budget neutral. *Cf. id.* § 1395*l*(t)(2)(F). But "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *cf. Air Alliance Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[I]t is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority."). If CMS reads the statute correctly, its new-found authority would supersede Congress' carefully crafted relative payment system by severing the connection between a service's payment rate and its relative resource use. In the context of the

23

similarly-designed Physician Fee Schedule system, Congress expressly denounced this disconnect. *See* H.R. Rep. No. 105-149, at 1347-48 (1997) ("As a result, relative value units have become seriously distorted. This distortion violates the basic principle underlying the resource-based relative value scale (RBRVS), namely that each services [sic] should be paid the same amount regardless of the patient or service to which it is attached."). Further, the structure of the Outpatient Prospective Payment System makes clear that Congress intended to preserve "the clinical integrity of the groups and weights." 42 U.S.C. § 1395*l*(t)(9)(A). There is no reason to think that Congress with one hand granted CMS the authority to upend such a "basic principle" of the Outpatient Prospective Payment System while working with the other to preserve it.[9]

The government also argues that Congress knew how to require budget neutrality when it wanted to, and that its silence in the context of paragraph (t)(2)(F) is telling. Not only does this argument fail to address damage to the integrity of the relative payment system, but in the context of the Outpatient Prospective Payment System, the reverse is also true: for decisions within CMS' discretion that might affect overall expenditures, Congress made clear when budget neutrality was *not* required. *See id.* § 1395*l*(t)(7)(I) (exempting transitional payments from budget neutrality); *id.* § 1395*l*(t)(16)(D)(iii) (exempting special payments from budget neutrality); *id.* § 1395*l*(t)(20) (exempting the effects of certain incentives from budget neutrality); *cf. id.* § 1395*l*(t)(3)(C) (permitting negative conversion factors); *id.* § 1395*l*(t)(14)(H) (exempting specific expenditure increases from consideration under paragraph (t)(9)). As CMS

---

[9] CMS' interpretation would also swallow paragraph (t)(9)(C) in its entirety: why would the agency go through the annual hassle of updating the conversion factor if it could use paragraph (t)(2)(F) to decrease or increase payment rates for disfavored or favored services whenever desired?

has said, "the OPPS is a budget neutral payment system." 72 Fed. Reg. at 66,615. Given how pervasively the statute requires budget neutrality in the Outpatient Prospective Payment System, Congress clearly considered effects on total expenditures critical to that system. Yet Congress did not mention the budgetary impact of paragraph (t)(2)(F) at all. The Court concludes that no such reference was made because Congress did not intend CMS to use an untethered "method" to directly alter expenditures independent of other processes. To the contrary, Congress directed that any "methods" developed under paragraph (t)(2)(F) be implemented through other provisions of the statute.[10]

Finally, the government argues that there is no reason Congress would have wanted CMS to penalize all outpatient departments in order to control unnecessary increases in the volume of a single type of service. Of course, that is exactly what Congress did when it applied the Sustainable Growth Rate formula to the Physician Fee Schedule under the Balanced Budget Act of 1997—the same Act which created the Outpatient Prospective Payment System— to disastrous results. *See* Jim Hahn & Janemarie Mulvey, Congressional Research Service, Medicare Physician Payment Updates and the Sustainable Growth Rate (SGR) System 8 (2012) ("There is a growing consensus among observers that the SGR system is fundamentally flawed and is creating instability in the Medicare program for providers and beneficiaries."); *id.* ("One commonly asserted criticism is that the SGR system treats all services and physicians equally . . . to the detriment of physicians who are 'unduly' penalized."). Congress recognized its error and

---

[10] Paragraph (t)(9)(C) explicitly provides that methods developed under paragraph (t)(2)(F) may result in adjustments to the conversion factor because subsection (t)(3), governing the conversion factor, does not already provide CMS such authority. *Cf.* 42 U.S.C. § 1395*l*(t)(9)(A) (requiring CMS to review and adjust groups and relative payments weights and adjustments for OPD services). Put another way, the provision is permissive, not mandatory, because CMS may choose to implement its methods through other means.

repealed the Sustainable Growth Rate formula, *see* Medicare Access and CHIP Reauthorization Act of 2015, Pub. L. No. 114-10, 129 Stat. 87, and it has demonstrated that it retains for itself the authority to make these and similarly selective funding decisions in this highly complicated intersection of patient needs, medical care, and government funding through the relative payment weight system. *See, e.g.*, Bipartisan Budget Act § 603 (establishing different payment schemes for excepted and non-excepted PBDs). Here, Congress has developed a multi-factored, complicated annual process whereby CMS is to pre-set relative payments for OPD services. This annual process would be totally ignored and circumvented if CMS could unilaterally set OPD service-specific rates without regard to their relative position or budget neutrality.

For these reasons, the Court finds that the "method" developed by CMS to cut costs is impermissible and violates its obligations under the statute. While the intention of CMS is clear, it would acquire unilateral authority to pick and choose what to pay for OPD services, which clearly was not Congress' intention. The Court find that the Final Rule is *ultra vires*.[11]

## C. Remedies

A brief note on remedies. Plaintiffs not only ask for *vacatur* of the Final Rule, but also for a court order requiring CMS to issue payments improperly withheld due to the Final Rule. Plaintiffs' request will be denied. "'Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.'" *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400 (D.C. Cir. 2005) (quoting *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999)). That said,

---

[11] Because the Court concludes that service-specific unilateral price setting by CMS is not a "method" within the meaning of the statute, the Court does not reach Plaintiffs' other arguments.

Outpatient Prospective Payment System reimbursements are complex and a third set of plaintiffs in another case challenging the same rule has raised the spectre of complications resulting from an order to vacate. *See* Opposition to Defendant's Motion to Stay Proceedings, *Sisters of Charity Hospital of Buffalo, New York v. Azar*, No. 19-1446 (RMC) (July 25, 2019) Dkt. 13. Other courts in this district have wrestled with the ripple effects of *vacatur* caused by Medicare budget neutrality provisions and interest payments. *See Am. Hosp. Ass'n*, 348 F. Supp. 3d at 85-86 (requiring further briefing on remedies related to OPPS adjustments); *Shands Jacksonville Med. Ctr., Inc. v. Azar*, 2019 WL 1228061, at *2 (D.D.C. Mar. 15, 2019) (addressing plaintiff-specific interest payments on improper reimbursement determinations); *see also Amgen*, 357 F.3d at 112 ("Other circuits have noted the havoc piecemeal review of OPPS payments could bring about."). The Final Rule is less than one year old and did not apply budget neutrality principles. These factors should lessen the burden on reconsideration. Nonetheless, the Court will require a joint status report to determine if additional briefing is appropriate.

## IV.   CONCLUSION

CMS believes it is paying millions of taxpayer dollars for patient services in hospital outpatient departments that could be provided at less expense in physician offices. CMS may be correct. But CMS was not authorized to ignore the statutory process for setting payment rates in the Outpatient Prospective Payment System and to lower payments only for certain services performed by certain providers. Plaintiffs' Motion for Summary Judgment, Dkt. 14, will be granted. The government's Cross-Motion for Summary Judgment, Dkt. 20, will be denied. The Court will vacate the applicable portions of the Final Rule and remand the matter for further proceedings consistent with this Memorandum Opinion. The parties will be required to submit a joint status report by October 1, 2019, to determine if additional briefing on remedies

is required, along with the CMS estimate as to the duration of further proceedings.  A memorializing Order accompanies this Memorandum Opinion.

Date:  September 17, 2019

_____
ROSEMARY M. COLLYER
United States District Judge

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |
| **AMERICAN HOSPITAL** ) | |
| **ASSOCIATION,** *et al.***,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 18-2841 (RMC)** |
| ) | |
| **ALEX M. AZAR II,** ) | |
| **Secretary of the Department of Health** ) | |
| **and Human Services,** ) | |
| ) | |
| **Defendant.** ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |

## ORDER

For the reasons articulated in the Memorandum Opinion issued

contemporaneously with this Order, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment, Dkt. 14, is

**GRANTED**; and it is

**FURTHER ORDERED** that the Secretary's Cross-Motion for Summary

Judgment, Dkt. 20, is **DENIED**; and it is

**FUTHER ORDERED** that the Secretary's Method to Control for Unnecessary

Increases in the Volume of Outpatient Services, 83 Fed. Reg. 58,818, 59,004-15 (Nov. 21, 2018)

(Section X.B), is **VACATED** and this matter **REMANDED** to the Secretary for further

proceedings consistent with the Memorandum Opinion; and it is

**FURTHER ORDERED** that the parties shall submit a joint status report by no later than October 1, 2019, discussing whether additional briefing regarding remedies is necessary.

Date:  September 17, 2019

_____
ROSEMARY M. COLLYER
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN HOSPITAL ASSOCIATION, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 18-2841 (RMC) |
| ALEX M. AZAR II, Secretary of the Department of Health and Human Services, | ) ) ) ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION

Previously, the Court held that the Centers for Medicare & Medicaid Services (CMS) exceeded its statutory authority when it selectively reduced by Final Rule reimbursement rates under the Outpatient Prospective Payment System (OPPS) to off-campus provider-based departments for certain outpatient department (OPD) services. *See Am. Hosp. Ass'n v. Azar*, No. 18-2841, 2019 WL 4451984 (D.D.C. Sept. 17, 2019); 83 Fed. Reg. 58,818 (Nov. 21, 2018) (Final Rule). Specifically, the Court determined that the addition of a non-budget-neutral rate reduction for Evaluation and Management (E&M) services at such facilities—separate from the normal OPPS reimbursement schedule—conflicted with the overall statute. *Am. Hosp. Ass'n*, 2019 WL 4451984, at *8-12. Accordingly, the Court vacated the relevant portions of the Final Rule, left intact the rest of the OPPS reimbursement schedule, and remanded the matter back to the agency for proceedings consistent with its decision. *Id.* at *12. However, given the complexities of setting and administering Medicare payments rates, the Court also ordered the parties to submit a status report to determine if additional briefing was required. *Id.*

1

CMS now asks the Court to modify its Order and to instead remand the matter to the agency to develop a remedy in the first instance, without vacatur. Alternatively, CMS asks for a 60-day stay of the Order while it considers whether or not to appeal. Plaintiffs oppose.[1] For the reasons below, the Court will neither modify nor stay the Order.

## I. ANALYSIS

### A. Vacatur

The D.C. Circuit has "made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). That said, a court has discretion to remand an unlawful rule without vacatur depending on (1) "the seriousness of the [rule]'s deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear-Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Neither factor is dispositive. "Rather, resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015) (*Shands I*).

As to the first factor, CMS "respectfully disagrees" with the Court's decision and maintains that its rate cut was a permissible "method for controlling unnecessary increases in the volume of covered OPD services." *See* 42 U.S.C. § 1395*l*(t)(2)(F). CMS thus argues that there is a live question regarding "whether the agency chose correctly" that may be resolved on appeal.

---

[1] *See* 9/17/2019 Order [Dkt. 32]; Mot. to Modify Order (Mot.) [Dkt. 33]; Pls.' Opp'n to Def.'s Mot. to Modify Order [Dkt. 34]; Mem. of the Univ. of Kansas Hosp. Auth. Pls. in Opp'n to Mot. to Modify [Dkt. 35]; Reply in Supp. of Mot. to Modify Order (Reply) [Dkt. 37].

CMS devotes little space to this argument. This factor may weigh in the government's favor when a decision within the agency's discretion was potentially lawful but insufficiently explained. *See Heartland Reg'l Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a decision, the first factor in *Allied-Signal* counsels remand without vacatur."); *see, e.g.*, *Allied Signal*, 988 F.2d at 151 ("It is conceivable that the Commission may be able to explain how the principles supporting an exemption for education institutions do not justify a similar exemption for domestic $UF_6$ converters."); *cf. Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 13 (D.D.C. 2019) (finding a CMS rule could not be justified because the necessary data did not exist). But here the Court determined that CMS put forth an impermissible interpretation of the statutory scheme; no amount of new data or reasoning on remand can save its interpretation. *See Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 137 (D.D.C. 2014) ("[T]he Court is certain that the agency cannot arrive at the same conclusions reached in the Final Rule because the actions taken were not statutorily authorized."). Nor does its hope of reversal on appeal help because "[p]ossible success on appeal would weigh against vacatur in every case, given that reversal is always a possibility." *Am. Hosp. Ass'n*, 385 F. Supp. 3d at 13. The first factor clearly favors vacatur.

As to the second factor, CMS argues more forcefully that for several reasons the disruption caused by vacating the rule weighs heavily in favor of remand only. First, CMS contends that without the rule "there is currently no extant methodology under which the Secretary may pay off-campus provider-based departments for the . . . services that the challenged portion of the Rule addressed." Mot. at 5. CMS similarly contends that "there is no methodology available for affected off-campus provider-based departments to calculate appropriate patient co-payments." *Id.*

3

These contentions fail to convince. Because CMS believed that it had authority to implement the E&M rate reduction independent of its authority to review and adjust OPPS relative payment weights, it developed underlying OPPS reimbursement rates and then tacked the E&M rate reduction on at the end. *See* Final Rule at 59,014 (applying the reduced E&M rates to the "final payment rates" for OPPS). As Plaintiffs describe it, CMS created an exception to OPPS reimbursement rates for only E&M services and only at applicable off-campus provider-based departments; vacating the rate reduction for E&M services at off-campus provider-based departments merely reverted such off-campus provider-based departments to the general rule. Indeed, CMS admits that there are extant OPPS reimbursement rates for *on*-campus provider-based departments which the relevant off-campus provider-based departments would have been subject to but for the Final Rule.[2] *See* Mot. at 6.

Anticipating this, CMS argues that vacatur leaves behind no OPPS reimbursement rates because the rate reduction for E&M services "cannot be severed from the rest of the OPPS rates set forth in the [Final] Rule." *Id.* at 5. The D.C. Circuit has held that "[s]everance and affirmance of a portion of an administrative regulation is improper if there is 'substantial doubt' that the agency would have adopted the severed portion on its own." *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir 1997). CMS asserts that it accounted for its projected $300 million in projected savings when developing the underlying OPPS

---

[2] CMS argues that payments to off-campus provider-based departments for E&M services would not revert to the general rule because such services have been carved out and reduced. *See* Reply at 3. Only the challenged rate reduction carved E&M services out of the general rule; all other patient services at off-campus provider-based departments continue to be paid at OPPS rates. The rate reduction was vacated as beyond the authority of CMS; therefore, such selected services are no longer carved out and should be paid according to the general rule.

reimbursement rates, and that without the rate reduction for E&M services it might have utilized other statutory means to accomplish the same ends or cut reimbursement rates across the board.

There is not nearly enough evidence to find "'substantial doubt' that the agency would have adopted the severed portion on its own." *Id.* To start, that the rate reduction for E&M services can be so easily severed from the Final Rule as a practical matter strongly suggests that severance is appropriate as a legal matter. *See Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 72 (D.C. Cir. 2017) ("Thus we have severed provisions when 'they operate[d] entirely independently of one another.'") (quoting *Davis Cty.*, 108 F.3d at 1459). That is, unlike other cases, the underlying OPPS reimbursement rates here were not "expressly conditioned" on rate reduction for E&M services. *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984). Further, this is not a case where the remaining rule starts to lose meaning without the severed portion. *See MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732, 740 (D.C. Cir. 2001) (examining "whether a *statute's* function would be impaired if, after invaliding a portion of an implementing regulation, the Court left the rest of the regulation in place"). Indeed, there is no evidence at all that CMS considered the underlying OPPS reimbursement scheme when it decided to reduce rates for E&M services at off-campus provider-based departments, other than to note that the OPPS reimbursement rates were higher than comparable rates at physician offices. Rather, the reduced rate for E&M services "operate[d] entirely independently" of the underlying OPPS reimbursement scheme and was "not in any way 'intertwined'" with CMS's obligation to review and set those underlying OPPS reimbursement rates. *Davis Cty.*, 108 F.3d at 1459 (quoting *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994)). In fact, that independence was CMS's explanation for why budget neutrality did not apply. *See* Def.'s Opp'n to Pls.' Mot. for Summ. J. & Mem. in Supp. of Mot. to Dismiss or, in the Alternative, Cross-

Mot. for Summ. J. [Dkt. 20-1] at 14-15. Regardless of what CMS hypothetically might have done, nothing in the Final Rule implies that the E&M rate reduction and underlying OPPS reimbursement rates were intended to be inseparable.

The Court further notes that the only material difference between the Proposed Rule and the Final Rule is that CMS chose to implement the rate reduction for E&M services over two years instead of one. *Compare* 83 Fed. Reg. 37,046, 37,143 (July 31, 2018) (Proposed Rule), *with* Final Rule at 59,013-14. CMS thus projected it would save only $300 million due to the Final Rule, or half of the $600 million originally projected. *See* Final Rule at 59,014. Yet CMS did not change the underlying OPPS reimbursement rates in the Final Rule to account for the $300 million shortfall caused by phased implementation. CMS does not explain why the $300 million shortfall caused by vacatur should be treated differently. CMS's silence in the Final Rule indicates that it would have implemented the underlying OPPS reimbursement rates even without a rate reduction for E&M services and also favors vacatur. *Cf. North Carolina*, 730 F.2d at 796 (severing a regulation despite resulting "nominal effects").

Second, CMS argues that vacating the Final Rule would prove disruptive if CMS were to succeed on appeal because, as a practical matter, it would be difficult for CMS to claw back any overpayments due to the administrative costs of doing so. *See* Mot. at 6. However, if CMS were to lose on appeal, this disruption would not come to pass. That may seem obvious, but the point is that CMS's argument has nothing to do with the appropriateness of vacatur in this case, only its timing; CMS's argument better supports its request for a stay pending appeal and is addressed below.[3]

---

[3] Although the D.C. Circuit has noted "the havoc that piecemeal review of OPPS payments could bring about," *Amgen, Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004), that havoc is born of the

6

Finally, CMS argues that the Court should grant CMS the opportunity to develop a remedy in the first instance, in recognition of the "substantial deference that Courts owe to the Secretary in the administration of such a 'complex statutory and regulatory regime.'" *Shands Jacksonville Med. Ctr., Inc. v. Azar*, 366 F. Supp. 3d 32, 54 (D.D.C. 2018) (quoting *Good Samartian Hosp. v. Shalala*, 508 U.S. 402, 404 (1993)); *see also N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012). But in each of the cases cited by CMS, deference was not an independent reason to remand without vacatur. Rather, remand without vacatur was found appropriate only after application of the *Allied-Signal* factors. *See N. Air Cargo*, 674 F.3d at 860-61; *Am. Hosp. Ass'n*, 385 F. Supp. 3d at 12-15; *Shands I*, 139 F. Supp. at 269-70. For the reasons above, those factors do not favor CMS here.

### B. Stay of the Order

District courts generally have the authority to stay their orders pending appeal. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); Fed. R. Civ. P. 62(c). But in determining whether to grant a stay, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton*, 481 U.S. at 776. At most, CMS has only hinted at irreparable harm. *But cf. Tataranowicz v. Sullivan*, No. 90-0935, 1991 WL 57005, at *1 (D.D.C. Feb. 26, 1991) (finding disbursement of

---

prospective and budget neutral elements of the statutory scheme, neither of which is implicated here. Vacating the select rate reduction does not directly affect the broader reimbursement scheme. *Cf. Am. Hosp. Ass'n*, 385 F. Supp. 3d at 12-15 (declining to vacate an *ultra vires* budget neutral rule).

Medicare payments and administrative costs of recoupment are not irreparable harm). It has completely ignored the other factors. Without more, CMS has not satisfied its burden.

## II. CONCLUSION

The *ultra vires* consequences of the Final Rule are not so complex that they cannot be directly redressed or undone. Vacatur and remand are the correct remedies and CMS has not established that a stay is appropriate at this time. The government's Motion to Modify Order, Dkt. 33, will be denied. The Court will enter final judgment. A memorializing Order accompanies this Memorandum Opinion.

Date: October 21, 2019

ROSEMARY M. COLLYER
United States District Judge

8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **AMERICAN HOSPITAL ASSOCIATION**, *et al.*, | ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) | Civil Action No. 18-2841 (RMC) |
| **ALEX M. AZAR II, Secretary of the Department of Health and Human Services,** | ) ) ) ) ) |  |
| Defendant. | ) ) |  |

## ORDER

For the reasons in the Memorandum Opinion issued contemporaneously with this

Order, it is hereby

**ORDERED** that Defendant's Motion to Modify Order, Dkt. 33, is **DENIED**.

This is a final appealable Order. *See* Fed. R. App. P. 4. This case is closed.

Date: October 21, 2019

ROSEMARY M. COLLYER
United States District Judge

1